## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIMOTHY L. DOYLE,                    )
                                     )
        Plaintiff,                   )
                                     )
        vs.                          )    Civil Action No. 06-1465
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Timothy L. Doyle and Defendant Michael J. Astrue, Commissioner of Social Security.[1] Plaintiff seeks review of final decisions by the Commissioner denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and denying in part his claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as he seeks remand for further consideration by the Commissioner.

---

[1] Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Timothy L. Doyle left school after completing the tenth grade; he later earned a GED and worked intermittently as a taxi driver, mechanic, roofer, and store clerk. He also attended trade school for training as a welder and over-the-road truck driver.    He was working in the latter occupation on November 8, 1999, when he went to a hospital emergency room for treatment after he developed swelling and severe blisters on both arms and hands along with general flu-like symptoms.

As a result of blood tests to determine the cause of the blisters and swelling, he was diagnosed with hepatitis C and porphyria cutanea tarda[2].    Because of the anticipated side effects

---

[2]    Hepatitis C is an inflammation of the liver caused by a viral infection.    Many people who are infected with hepatitis C do not have symptoms and it is often detected during blood tests for a routine physical or other medical procedures.    Although it is incurable, some patients benefit from treatment with interferon alpha injections or a combination of interferon alpha and ribavirin; each treatment has numerous serious side effects.    At least 80% of patients with acute hepatitis C ultimately develop chronic liver infection, 20% to 30% develop cirrhosis, and between 1% and 5% may develop liver cancer. *See* the medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/ medlineplus (last visited March 24, 2008), "MedlinePlus."
    Porphyria cutanea tarda ("PCT") is the most common of a rare group of hereditary disorders in which heme, an element of hemoglobin and myoglobin (a protein found in certain muscles), does not develop properly in the liver.    Consequently, chemicals called porphyrins build up in the body, leading to rashes, light sensitivity, abdominal pain and many other symptoms.    PCT may also be acquired in conjunction with hepatitis C, among other precipitating factors.    Although it is a chronic condition, patients may experience acute attacks of the symptoms.    Exposure to sunlight can cause pain, sensations of heat, blistering, and skin redness and swelling.    Blisters heal slowly, often with scarring or skin color changes, and may be [continued]

2

of the long-term treatment for hepatitis C, he was advised by his physicians that he should stop working and "go on disability until the treatment is over." (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 16, "Tr.," at 513.) On December 28, 1999, Dr. Jeffrey Bedlion submitted an Employability Assessment Form on Plaintiff's behalf to the Pennsylvania Department of Public Welfare, indicating that he would be temporarily disabled for the period November 15, 1999, through March 9, 2000, because of his hand condition, surgery for an inguinal hernia,[3] and the hepatitis C treatment. (Tr. 327-328.) He also directed Plaintiff to undergo a series of phlebotomies to alleviate his porphyria. (Tr. 140.)

On February 7, 2000, Dr. Shirish Amin, a specialist in liver disease at the University of Pittsburgh Medical Center who was treating Mr. Doyle's hepatitis C, completed a second employability form, indicating that Mr. Doyle would be disabled for 12 months or

_____

disfiguring. Blood and urine tests can detect porphyria, along with a physical examination which may show related heart tachycardia, muscle weakness, and joint pain. Treatment consists of pain medication, a high carbohydrate diet and/or fluids and glucose to boost carbohydrate levels and limit the production of porphyrins, and phelbotomy to remove blood and thereby lower iron levels. *See* the medical encyclopedia at MedlinePlus.

[3] Mr. Doyle experienced no long-term effects from the surgery to repair the hernia; he was also diagnosed as having had hepatitis B in the past. He does not claim any disability from these conditions and they will not be discussed further.

3

more, beginning February 9, 2000.[4]  (Tr. 325-236.)  After blood tests, an abdominal ultrasound and liver biopsy confirmed the diagnosis of chronic hepatitis C, Mr. Doyle began receiving a drug called infergen[5] in April 2000, but stopped taking it after only five days because of severe flu-like symptoms and insomnia.  In a follow-up appointment with Dr. Amin, Mr. Doyle agreed to re-start the drug protocol, but despite medication, he continued to experienced the side effects.  (Tr. 236; 239-241.)

On October 31, 2000, after the infergen treatment period was over, Dr. Amin released Plaintiff to go back to work as a truck driver with no restrictions.  (Tr. 499.)  However, on January 22, 2001, Dr. Amin's records indicate that follow-up blood tests had revealed the treatment with infergen had been unsuccessful, i.e., Plaintiff still showed active liver disease.  Plaintiff's chief complaint at that time was fatigue, but he denied depression or

_____

[4]  The doctor's handwriting on the form at this point is completely illegible but we infer that he intended the period to be 12 months or more based on the section of the form which was completed. This conclusion is further supported by a note from Dr. Bedlion dated March 1, 2000, in which he stated "work status - Pittsburgh doctor wrote [??] patient off for 1 year."  (Tr. 138.)

[5]  Infergen (Interferon Alfacon-1) is used to treat hepatitis C infections.  The drug is injected subcutaneously three times a week. The effectiveness and side effects of the treatment must be carefully monitored and the length of treatment depends on the patient's individual response to the medication.  Side effects include flu-like reactions (i.e., chills, headache, fever, muscle pain, sweating, and joint pain), nervousness, pain and irritation at site of injection, difficulty sleeping, tiredness, dizziness, stomach pain, upset stomach, diarrhea, body aches, and headache.  The side effects usually become less severe and less frequent as the patient continues therapy. See drugs and supplements information at MedlinePlus.

4

suicidal ideation.  Dr. Amin recommended that Mr. Doyle be treated with a new drug combination of long-acting interferon and ribavirin[6] as soon as it was approved by the Food and Drug Administration. (Tr. 497-498.)

In April 2001, after Mr. Doyle continued to complain of fatigue, gastric reflux and insomnia, Dr. Amin began a second period of treatment with Rebetron, another combination of interferon and ribavirin.  This drug caused such acute side effects (severe headache, muscle pain and fatigue) that Mr. Doyle stopped the treatments after only two doses and was not, apparently, encouraged by his doctors to restart the treatment.  He continued to treat with Dr. Amin and, later with Dr. Kapil B. Chopra who took over Dr. Amin's practice at UPMC.[7]

On June 5, 2002, Mr. Doyle began a third treatment regime, this time with the newly-approved pegylated interferon alpha.[8]  However,

---

[6] Ribavirin is one of a class of antiviral medications called nucleoside analogues which work by stopping the hepatitis C virus from spreading inside the body.  To be effective, it must be used in conjunction with a form of interferon.  See drugs and supplements information at MedlinePlus.

[7] At one point in his summary judgment brief, Defendant appears to argue that Plaintiff's hepatitis was not severe because over a year elapsed between his aborted treatment with Rebetron in April 2001 until he began treatment with pegylated interferon in June 2002. (Def.'s Brief at 13.)  A fair reading of the entire medical record, however, can equally support the conclusion that Mr. Doyle received no additional drug treatment during that period because his doctors were waiting for the new drug protocol to be approved by the FDA.

[8] Pegylated interferon alpha has a longer half-life than previous forms of interferon which means injections are taken weekly instead of the three times a week with standard interferon alpha. Pegylated interferon alpha and ribavirin lead to a sustained response

5

the side effects – nausea, headaches, chills, muscle aches, insomnia and fatigue – were so severe that again treatment was suspended as of June 21, 2002. (Tr. 672-675.)

B.   Procedural Background

As suggested by his doctors, Mr. Doyle had applied for supplemental security income benefits on February 8, 2000, alleging disability as of November 8, 1999, due to hepatitis C and porphyria cutanea tarda.    (Tr. 46-48; 62.)    On May 18, 2000, the Social Security Administration ("SSA") advised Mr. Doyle that it was denying benefits because the medical evidence did not support the conclusion that he was unable to work.  (Tr. 32.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held before Judge James S. Bukes on February 7, 2001, where Plaintiff was represented by counsel. Judge Bukes issued his decision on April 25, 2001, concluding that although Plaintiff could not return to any of his former occupations, he was able to perform a full range of sedentary work and thus was not eligible for benefits. (Tr. 10-18.) On August 7, 2001, the Social Security Appeals Council advised Mr. Doyle that it had chosen not to review the ALJ's decision[9] (Tr. 5-6); therefore,

_____

in approximately 50% of patients, i.e., the patient remains free of hepatitis C virus six months after stopping therapy.  *See* drugs and supplements information at MedlinePlus.

[9]   Usually, the next step in the administrative procedure would be for the Social Security Appeals Council to reconsider the ALJ's decision to determine if there had been an error of law or abuse of discretion on his part. In selected test cases, however, this review

6

the April 25, 2001 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in the United States District Court for the Western District of Pennsylvania on September 17, 2001, seeking judicial review of the ALJ's decision. *See* Doyle v. Barnhart, CA No. 01-1733.

On April 2, 2002, Judge Gary L. Lancaster denied Defendant's motion for summary judgment and granted Plaintiff's motion in part. (Tr. 369-380.) The Court found the ALJ had erred by failing to consider Plaintiff's non-exertional limitations,[10] particularly those identified by his long-term treating physician, Dr. Amin. Because the ALJ had failed to solicit the testimony of a vocational expert or to refer to another expert source of occupational information, there was no evidence in the record to support his conclusion that there were other jobs in the national economy which Mr. Doyle could perform with his combination of exertional and non-exertional

---

step has been omitted. *See* 20 C.F.R. §§ 404.966; 416.1406.

[10] "Exertional limitations" are those which affect a claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Non-exertional limitations include difficulties in functioning due to depression or anxiety; maintaining attention or concentration; understanding or remembering detailed instructions; seeing or hearing; tolerating environmental features (e.g., dust or fumes) associated with certain work settings; or performing the manipulative or postural functions of some work (e.g., reaching, handling, stooping, climbing, crawling, or crouching.) 20 C.F.R. § 404.1569a(c).

limitations.  (*See* Tr. 377-380, *citing* Sykes v. Apfel, 228 F.3d 259
at 270, 273 (3d Cir. 2000).)  The case was remanded to the SSA for
a new hearing at which a vocational expert would be called to
testify on this issue.

In the meantime, Mr. Doyle had filed a second application for
disability insurance benefits and supplemental security income
benefits on July 11, 2001, again with an alleged onset date of
November 8, 1999.  (Tr. 418-420; 677-679.)  These applications were
denied on January 25, 2002, for essentially the same reason as the
first, i.e., that Mr. Doyle could perform medium level work despite
his limitations from hepatitis C and depression.  (Tr. 682-685; 408-
411.)  Mr. Doyle sought review by an ALJ of that denial and the two
cases were consolidated before Judge Bukes.

A hearing was held on September 10, 2002, at which vocational
expert William H. Reed, Ph.D., testified.  On January 30, 2003,
Judge Bukes issued an opinion in which he denied benefits for the
period November 8, 1999, through June 20, 2002, but concluded that
Plaintiff was entirely disabled after that date.  (Tr. 398.)

On February 24, 2003, Plaintiff filed objections to that
portion of Judge Bukes' opinion denying benefits prior to June 21,
2002.  (Tr. 384-387.)  On September 19, 2006, more than three years
later, the Appeals Council declined to assume jurisdiction, finding
no error in the ALJ's January 30, 2003 opinion, which thus became
the SSA's final decision for purposes of judicial review.  (Tr. 381-

383.)[11]  Plaintiff filed suit in this Court on November 5, 2006.

C.    Jurisdiction

This    Court    has    jurisdiction    by    virtue    of    42    U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court of
the United States for the judicial district in which the plaintiff
resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact.  42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind

---

[11]   The Court finds this letter from the SSA extraordinarily
inaccurate.  For instance, the Administrative Appeals Judge wrote that
the ALJ had determined that Mr. Doyle was "capable of sedentary work
with a sit/stand option for the period prior to June 21, 2002" and
that Judge Bukes had taken into consideration Plaintiff's "relief
experienced from pain medications for the period prior to June 21,
2002."  (Tr. 381.)  The decision of January 30, 2003, contains no
reference to sedentary work with a sit/stand option, nor does it
discuss relief from pain medications.

might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes, 228 F.3d at 262.

**IV. ANALYSIS**

A.    The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe

10

he is unable to pursue substantial gainful employment[12] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000); 42 U.S.C. § 1382c(a)(3)(C)(I).

To be granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Doyle satisfied the first two non-medical requirements and the parties agree that Plaintiff's date last insured was December 31, 2001. Therefore, in order to receive a period of disability and DIB, Mr. Doyle must show that he became disabled prior to that date; no such timing requirement applies in the case of SSI benefits.

In determining a claimant's rights to either type of benefit,[13] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

_____

[12] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[13] The same test is used to determine disability for purposes of receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under either type of benefits.

11

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[14] to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[15] Sykes, 228 F.3d at 263.

Following the prescribed analysis in his decision of January

---

[14] Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001). Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[15] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

12

30, 2003,[16] Judge Bukes first concluded that Mr. Doyle had not engaged in substantial gainful activity since his alleged onset date of November 8, 1999.[17] At step two, the ALJ found Mr. Doyle's claimed impairments were hepatitis C, a depressive disorder, and an anxiety disorder, all of which were "severe" impairments as that term is defined by the SSA.[18] (Tr. 19-20.) However, at step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of Listing 5.05 (chronic liver disease), Listing 5.08 (weight loss due to any persisting gastrointestinal disorder),[19] Listing 12.04 (depressive disorders),

---

[16] As a threshold matter, Judge Bukes stated that the "evidence considered in connection with the prior hearing decision was adequately summarized therein and that decision is made a part hereof and incorporated by reference." (Tr. 393.) The Court has relied on portions of his April 25, 2001 opinion and has consolidated his analysis at each step in an attempt to streamline the process for the reader. However, there are several discrepancies between the two decisions which we have pointed out for the record.

[17] We note that this conclusion contradicts the earlier opinion which concluded Plaintiff had not worked since the date on which he initially filed for SSI benefits, February 8, 2000. (Tr. 17.)

[18] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

[19] It is unclear why the ALJ considered this Listing inasmuch as Mr. Doyle did not claim to have been disabled due to significant weight loss either as a result of hepatitis C or other gastro-intestinal disorder. The only relevant evidence pertaining to weight

13

or Listing 12.06 (anxiety disorders). (Tr. 395.)[20]

At step four, the ALJ stated that in arriving at his decision regarding the extent of Plaintiff's residual functional capacity, he had considered all the medical evidence, medical opinions from acceptable medical sources regarding the nature and severity of his complaints and the resulting limitations, and Plaintiff's subjective complaints. He concluded Mr. Doyle could perform a significant range of light unskilled work with the further limitations that such work involve only short, simple instructions, limited contact with the general public, and minimal changes in the work setting. In addition, his non-exertional limitations precluded working at heights, with moving machinery, or under temperature extremes and any activity requiring more than occasional postural activities, pushing, pulling, handling and reaching. (Tr. 397.) The ALJ noted

loss appears to be a note from Dr. Amin indicating that Plaintiff had lost eight pounds during the first two weeks of treatment with pegylated interferon. (Tr. 607.) The medical evidence shows that on March 9, 2000, Plaintiff weighed 139 pounds (Tr. 519) and on June 27, 2002, he weighed 148 pounds (Tr. 607), that is a gain of almost ten pounds over two years, despite having just lost 8 pounds during his latest treatment.

[20] In the first application for benefits, Plaintiff alleged disability due to hepatitis C and porphyria cutanea tarda. (*See* denial notice dated May 18, 2000, Tr. 32-35.) In the April 25, 2001 decision, the ALJ did not address porphyria at all, even though the blisters on Plaintiff's hands were discussed at length at the hearing and his counsel suggested that the skin condition be reviewed under Listing 8.00. (Tr. 352-354; 363-364; 367-368.) We assume the ALJ agreed, as Plaintiff testified, that the condition of his hands was a symptom of hepatitis rather than a separate impairment. Also, in the April 25, 2001 opinion, the ALJ found Plaintiff's depression was not severe; there was no claim at that time of an anxiety disorder, and the Judge inaccurately referred to Plaintiff's primary impairment as hepatitis B, not hepatitis C. (Tr. 14.)

14

that Dr. Reed, the vocational expert ("VE") who testified at the hearing, had indicated there were numerous unskilled light jobs available in the local and national economies which a person of Plaintiff's limitations could perform, e.g., an indoor security guard or an expediter. (Tr. 398; *see also* Tr. 716-717.)

Therefore, given Plaintiff's status as a younger individual[21] with the equivalent of a high school education, a work history of medium to heavy occupations which did not provide transferable skills, his RFC, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Mr. Doyle was not disabled at any time prior to June 21, 2002, and, consequently, not entitled to benefits. However, according to Judge Bukes, Mr. Doyle's condition had subsequently deteriorated and his fatigue, dizziness and headaches precluded working a full eight hour day. Therefore, he was granted supplemental security income benefits as of June 21, 2002. (Tr. 398.)

## B.    Plaintiff's Arguments

Plaintiff raises four arguments in his brief in support of the motion for summary judgment. (Supplemental Brief for Plaintiff, Docket No. 18, "Plf.'s Brief.") First, by concluding that Plaintiff was not disabled prior to June 21, 2002, the ALJ failed to properly consider and analyze the medical evidence of record which indicates

---

[21]    Plaintiff was 47 years old at the time of the hearing, meaning he fell within the category defined as a "younger individual," i.e., less than age 50.  20 C.F.R. §§ 404.1563 and 416.963.

that Mr. Doyle was disabled well before that date, in particular the assessments of his treating physicians Drs. Amin and Bedlion. (Plf.'s Brief at 7-11.) Second, the ALJ erred by concluding that Plaintiff had not been continuously disabled for the period November 8, 1999, through June 21, 2002. (Id. at 12.) Third, the ALJ failed to adequately explain why he found Plaintiff's testimony at the September 2002 hearing less than fully credible. That is, the conclusion that his testimony was not consistent with the medical evidence is unsupported because the ALJ failed to analyze critical portions of the medical evidence which were consistent with Plaintiff's testimony, failed to consider Plaintiff's subjective complaints which were consistent with that evidence, and mischaracterized Plaintiff's ability to perform activities of daily living. (Id. at 12-15.) Finally, the ALJ erred by finding that Plaintiff had sufficient RFC to perform light work but his hypothetical questions to the VE and, subsequently, his opinion refer to an ability to lift ten pounds occasionally and five pounds frequently, limitations which are consistent with sedentary work. (Id. at 15.)

Having reorganized these arguments somewhat, we agree with Plaintiff that the ALJ erred at several points in determining Mr. Doyle's RFC and that these errors, in turn, led to errors in framing the hypothetical questions to the Vocational Expert. Moreover, we also conclude the Vocational Expert's testimony was sufficiently

16

inaccurate that the ALJ erred by accepting it as substantial evidence that jobs existed in the local and national economies which Plaintiff could perform despite his limitations.

## C. Analysis of Plaintiff's Arguments

1. *Determination of Plaintiff's RFC:* In his analysis, the ALJ properly noted that in determining a claimant's residual functional capacity, his or her testimony and subjective complaints must be taken into consideration. (Tr. 395, *citing* 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Ruling[22] ("SSR") 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.") The regulations and SSR cited explicitly set out seven factors an ALJ must consider when a claimant's subjective symptoms suggest a greater severity of impairment than can be shown by objective medical evidence alone. Those factors include (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors which precipitate or aggravate the symptoms; (4) the type, dosage and effectiveness of medication taken to alleviate the symptoms and the side effects thereof; (5) treatments

---

[22] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

17

other than medication used to alleviate the symptoms; (6) any other measures used to relieve the symptoms; and (7) other factors concerning functional limitations or limitations due to pain or other symptoms.

The Court recognizes that the weight given to a claimant's allegations concerning subjective factors such as pain and fatigue depends in turn on the ALJ's view of the claimant's credibility. This determination by an ALJ is entitled to great deference by the district court. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). The determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001), *quoting* SSR 96-7p. This Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted). However, because the ALJ is best able to judge a witness's truthfulness, this Court will reject an ALJ's credibility determination only if it is "patently wrong." Schmidt v. Barnhart, 395 F.3d 737, 746-47 (7th Cir. 2005); *see also* Horodenski v. Comm'r

18

of Soc. Sec., No. 06-1813, 2007 U.S. App. LEXIS 2874, *15 (3d Cir. Feb. 7, 2007) ("where. . .the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to 'great deference.'")

Here, the ALJ noted Plaintiff's reports of extreme fatigue and side effects from his medication such as muscle aches and pains, chills, auditory hallucinations, loss of appetite and "his mind being scrabbled." (Tr. 395.) He further noted that Plaintiff claimed he needed to lie down daily to rest. He subsequently concluded, however, that as of April 10, 2002,[23] Plaintiff had reported in a questionnaire regarding his activities of daily living ("ADLs") that he could perform small household repairs, run errands, help with household chores, feed the dog, drive a vehicle, take public transportation alone, take out the trash, cook, vacuum, and carry grocery bags, Mr. Doyle had "somewhat overstated the incidence, duration and severity of his subjective complaints." Consequently, the ALJ found Plaintiff not to be "fully credible." (Tr. 396.)

The ALJ does not recognize that in the questionnaire completed on April 10, 2000, Mr. Doyle noted he needed to rest between activities because he was "fatigued all the time." (Tr 80.) His driving was limited to "a few blocks to the store and back" (Tr.

---

[23] The ALJ referred to an ADL questionnaire dated April 10, 2002, which does not exist in the record. (Tr. 396.) We assume that inasmuch as there is an ADL questionnaire dated April 10, 2000 (*see* Tr. 79-86), this reference is simply a typographical error.

19

80), and he could not do outdoor chores such as mowing the lawn or working in the yard (Tr. 61.) If he did more than usual activities on any particular day, he experienced fever, chills, muscle aches, fatigue and nausea. (Tr. 79.) Nor does the ALJ take note of the undated ADL questionnaire completed in connection with Plaintiff's second application for benefits in which he stated that he was "always tired," and when he did more than usual, "I'm that much more tired." (Tr. 438.) His wife took care of most of the household chores and he helped out when he could. (Id.) He indicated he could drive and take out the trash when he was not on medication, could prepare simple meals in the microwave, and use a vacuum cleaner when "I'm up to it." (Tr. 439.) He reported he had not participated in hobbies or other activities for enjoyment since he became ill. He tried to help out with house cleaning when he was up to it, but did no home maintenance or laundry. (Tr. 440.) He again noted that he had to stop and rest between activities and "usually just being out and about" caused fatigue such that he would have to take a nap. (Tr. 440.) Plaintiff further explained that when he was "off the medication, my fatigue is fairly consteint [sic]" but "on the medication it is much worse." (Id.)

With regard to the effects of porphyria, Mr. Doyle stated that his hands would get very dry, the skin cracked, and his pain was "crippling." When his hands were "acting up," it was painful to fasten buttons or snaps on clothing or tie his shoes. He also

20

reported that moving his hands increased the pain and that it was severe enough to wake him from sleep. "There is not much I can do with my hands when the porphyria is acting up." (Tr. 441-443.)

Of the seven factors identified in SSR 96-7p, the only one directly addressed was Plaintiff's ADLs, a point acknowledged by Defendant in his brief in support of his motion for summary judgment. *See* Docket No. 20 ("Def.'s Brief"), at 16, stating that the "ALJ correctly considered [Plaintiff's] self-reported daily activities which demonstrate that contrary to his allegations of pain and other subjective symptoms, he remained capable of working through June 21, 2002." However, as indicated, we find the ALJ's analysis of this factor selective and incomplete, particularly since the second questionnaire was not addressed at all. *See* Canales v. Barnhart, 308 F. Supp.2d 523, 527-528 (E.D. Pa. 2004), declining remand and granting benefits where the ALJ's analysis under SSR 96-7p was similarly based only on activities of daily living. Nor did the ALJ cite to any evidence which contradicted Plaintiff's assertions about his subjective symptoms. To the contrary, the medical record reflects numerous occasions on which Plaintiff complained of fatigue, insomnia, reflux, headaches, and muscle pain, even when he was not undergoing chemotherapy. *See*, e.g., Tr. 497 (January 2001) 495-496 (April 2001, before starting Rebetron); 611 (May 2002.)

In determining Plaintiff's RFC, the ALJ also relied on a

21

medical assessment of ability to do work-related activities
completed by Dr. Amin on October 23, 2000.[24] (Tr. 247-249.) Based
on Dr. Amin's recommended limitations, the ALJ concluded that
Plaintiff could occasionally lift a maximum of ten pounds and
frequently lift five pounds; must avoid heights, moving machinery,
and temperature extremes; and could occasionally perform postural
activities, but only limited pushing, pulling, handling and
reaching. (Tr. 397.) We find the ALJ's choice of these particular
restrictions confusing and inconsistent.

We note as a threshold matter that for reasons which are
unexplained in the record, Dr. Amin completed medical assessments on
both October 17 and October 23, 2000. In the first report, Dr. Amin
indicated Plaintiff could lift and carry weight no more than one-
third of an eight-hour work day but did not state the maximum weight
involved. He could walk and stand a total of two hours a day –
"maybe" without interruption – and could sit a total of four hours
a day without interruption. He could occasionally – i.e., up to
one-third of the day – climb, balance, stoop, crouch, kneel and
crawl. His ability to reach, handle, feel, push and pull was
negatively affected by his impairments and he was not able to work
at heights, around moving machinery, or under temperature extremes.

_____

[24] The ALJ also noted at this point in his decision that counsel
for Mr. Doyle agreed at the September 10, 2002 hearing to ask Dr.
Chopra to send an updated residual functional capacity evaluation, but
provided only Exhibit 13F which did not include such an evaluation.
(Tr. 396; see also Tr. 606-621.)

22

(Tr. 244-246.)

In the assessment dated October 23, 2000, Dr. Amin indicated that Plaintiff could lift and carry ten pounds occasionally and five pounds frequently; his standing and walking were unaffected; he could sit for a total of six hours uninterrupted and occasionally perform all the postural functions, i.e., climb, balance, etc. In addition to the physical functions noted above, his ability to see, hear and speak were also affected and he was subject to all environmental restrictions, i.e., heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, vibration and "other." (Tr. 247-249.)

It appears that in evaluating Dr. Amin's opinions about Plaintiff's physical abilities, the ALJ chose some from the October 17, 2000, report and others from the October 23, 2000 report. That is, from the second assessment, the ALJ took the ability to lift and carry ten pounds occasionally and five pounds frequently, but chose the postural and environmental restrictions indicated in the first assessment. The ALJ did not indicate which of Dr. Amin's assessments regarding Plaintiff's ability to stand, walk, and sit he had adopted, but the Court notes that if Plaintiff were able to only walk and stand two hours a day and sit for no more than four hours, i.e., a total of six hours (as stated in the first assessment), he could not perform even sedentary work on a regular and continuing basis. *See* SSR 83-10, defining sedentary work as requiring no more

23

than approximately two hours of standing or walking plus six hours of sitting per eight-hour work day. Conversely, if his ability to stand and walk were unaffected and he could sit for a total of six hours uninterrupted (as stated in the second assessment), he could perform light or sedentary work. The fact that the ALJ did not mention any standing, walking or sitting restrictions in his base hypothetical questions,[25] but rather referred to "light" work indicates he must have chosen the standing, walking, and sitting descriptions from the October 23, 2000 report.

This use of some restrictions from each of two reports gives rise to even more confusion when one considers the fact that in the April 25, 2001 opinion (which the ALJ specifically stated was incorporated by reference in the opinion of January 30, 2003), the ALJ relied on Dr. Amin's assessment of October 23 which he found "generally commensurate with the capacity to engage in sedentary work." (Tr. 15.)

An ALJ must "consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional determination." Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir. 2000). We conclude that in the absence of an

_____

[25] The ALJ did ask the VE a follow up question, inquiring if all full time jobs would be eliminated if the hypothetical individual were limited to "a total of standing for one hour in an eight-hour day, sitting for only two hours." The VE responded that they would. (Tr. 718.) According to the ALJ, this limitation was based on Dr. Sartori's assessment. (Id.) The Court has been unable to identify any basis for this limitation in Dr. Sartori's report, which does not mention Plaintiff's ability to stand or sit. See Tr. 652-655.

24

explanation by the ALJ as to why he did not address any factors at step four other than Plaintiff's ADLs (contrary to the directives of SSR 06-7p) and why he adopted a "pick-and-choose" method of identifying functional limitations from Dr. Amin's reports, this Court is unable to perform a meaningful review of the ALJ's residual functional capacity determination and we are compelled to remand this matter for clarification. *See* Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (while the Third Circuit Court of Appeals does not require an ALJ "to use particular language or adhere to a particular format in conducting his analysis," he must provide sufficient explanation of his findings to permit "meaningful review.")

2. *Omission of Relevant Limitations from the Hypothetical Questions:* Based on our review of the ALJ's opinion and the medical record, we conclude significant limitations were omitted when framing the hypothetical questions, or conversely, in rejecting questions which did incorporate those limitations as not indicative of his true limitations. (Tr. 398.) The first of these are certain mental or work adaptation limitations and the second pertain to Plaintiff's skin condition.

It is obvious from the ALJ's first hypothetical question that he relied on a mental evaluation prepared by a one-time consulting psychologist, Dr. Martin Meyer, when restricting Plaintiff to work which involved only short, simple instructions, no direct

interaction with the general public, and no changes in the work setting. (Tr. 715; *see also* Tr. 558-559.) However, at least three other restrictions identified by Dr. Meyer were omitted from the ALJ's hypothetical questions, that is, no more than a fair ability to act independently or to relate to co-workers (Tr. 558) and the inability to maintain a consistent work pace due to physical problems and easy fatigue (Tr. 557.) The ALJ did not explain why he rejected the latter restrictions while relying on Dr. Meyer's opinion for the first three.

The law is well established in this Circuit that general references such as restrictions to work involving only "short, simple instructions" do not necessarily convey the full range of mental deficiencies in many cases. *See* Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (ALJ's limitations to "simple, repetitive one, two-step tasks" did not take into account claimant's borderline intelligence); Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004) (rejecting ALJ's language which did not convey the claimant's acknowledged deficiencies in concentration, persistence or pace; Troche v. Comm'r of Soc. Sec., CA No. 07-780, 2008 U.S. Dist. LEXIS 21792, *21 (D. N.J. Mar. 19, 2008) (accepting the ALJ's "more nuanced" questions which incorporated psychologists' opinions that claimant could concentrate and carry out simple instructions but had difficulty abstracting and using judgment); Barry v. Astrue, CA No. 05-1825, 2007 U.S. Dist. LEXIS 49199, *13-*14 (E.D. Pa. July 9,

26

2007) (ALJ's restriction to simple, low stress, jobs involving only limited contact with the public and co-workers did not sufficiently address medically established moderate limitations on concentration, persistence and pace); Thompson v. Barnhart, CA No. 05-395, 2006 U.S. Dist. LEXIS 11053, *43-*44 (E.D. Pa. Mar. 17, 2006) (where ALJ failed to include in his questions claimant's mental impairments identified in his decision, the case would be remanded.) Here, it is unclear if the ALJ intentionally or inadvertently omitted Plaintiff's recognized limitations in acting independently, relating to co-workers and maintaining a consistent work pace or if he intended his reference to "short-simple instructions, no detailed instructions" to encompass those limitations. In the latter case, we would be compelled to conclude that such language did not encompass the limitations identified by Dr. Meyer. In order to clarify this uncertainty, we must remand.

We also find that the ALJ's hypothetical questions failed to consider limitations which could be imposed by the blisters and swelling in Plaintiff's hands. At the hearing on September 10, 2002, counsel for Mr. Doyle argued that the blisters on his upper extremities should be analyzed under Listing 8.00.[26]   Counsel explained that during the period November 1999 through "the first

_____

[26]   Listing 8.00 refers to a number of skin disorders that may result from hereditary, congenital or acquired pathological processes; however, porphyria cutanea tarda is not specifically addressed. The severity, frequency of flare-ups, symptoms (including pain), treatment and the effects thereof, and duration of extensive skin lesions are all considered in determining if a disorder satisfies the Listing.

27

part of 2000," the skin effects themselves were the disabling
condition, as stated in the employability assessment forms completed
by Drs. Amin and Bedlion. At that time, he was taking "four or
five" Darvocet tablets a day to reduce the severe pain in his hands.
When he was not undergoing phlebotomy treatments, the blisters and
lesions returned. (Tr. 702.)

In the January 30, 2003 opinion, the ALJ acknowledged that
Plaintiff's first application for SSI benefits alleged disability
due in part to porphyria, and he referred several times to
"blisters" and "skin lesions" on Plaintiff's upper extremities,
usually noting that on physical examination, Plaintiff "had only
healed blisters or none at all." (Tr. 396.) He further commented
that at the September 2002 hearing, Mr. Doyle admitted he currently
had no blisters or other skin problems.[27]  (Id.)  However, in his
decision, the ALJ did not refer to Listing 8.00, did not attempt to
determine if Plaintiff's porphyria satisfied that Listing or was the
medical equivalent thereof, and did not reach a conclusion as to
whether Plaintiff's skin condition was a severe impairment even if
it did not satisfy the Listing (unless one assumes he found it not
severe inasmuch as he did not include it among those impairments he
did find severe, i.e., depression, anxiety and hepatitis C.)

_____

[27]  Plaintiff testified that he did not have blisters at the
hearing because he had just completed two months of phlebotomy
treatments.  (Tr. 702.)

28

Similarly, at the hearing on February 7, 2001, the condition of Plaintiff's hands had been extensively discussed (*see*, e.g., Tr. 351-352, 360, 363-364) and counsel for Plaintiff had also encouraged the ALJ to consider Listing 8.00 (Tr. 367-368.) However, in the April 2001 opinion, although he referred in passing to blisters on Mr. Doyle's hands, the ALJ concentrated on the rash which appeared at the injection sites on Plaintiff's legs when he was taking drug protocols, stating that it was controlled by over-the-counter medications. He did not arrive at any conclusion about the blisters and did not consider Listing 8.00 in the first opinion. He did, however, conclude that Plaintiff was capable of performing a full range of sedentary work activities. (Tr. 16.)

It is well established that many unskilled sedentary activities - and many light activities - require extensive use of the hands and arms. *See* Boone v. Barnhart, 353 F.3d 203, 211 (3d Cir. 2003) noting that the plaintiff's inability to perform repetitive hand movements would limit the number of unskilled sedentary jobs she could perform, citing SSR 83-14 ("Bilateral manual dexterity is necessary for the performance of substantially all unskilled sedentary occupations.") Since the ALJ (1) concluded that Plaintiff's hepatitis had "caused large blister-type lesions on his hands and that such lesions have been very painful" (Tr. 15), and (2) he was now limiting Plaintiff to unskilled work at the sedentary or light level, we find that he should have incorporated the

limitations caused by Plaintiff's porphyria in the hypothetical questions posed to the Vocational Expert, even if they occurred only intermittently and were alleviated by treatment. However, the hypothetical questions to Dr. Reed did not include any such references. As such, the questions were defective and the VE's responses to them cannot be considered substantial evidence on which to rest a denial of benefits. *See* Ramirez, 372 F.3d at 550 (the ALJ's hypothetical questions must reflect all of a claimant's impairments supported by the record or the vocational expert testimony cannot be considered substantial evidence), *citing* Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

　　　　3. *The ALJ's Reliance on Inaccurate Testimony by the Vocational Expert:* In his discussion with the VE at the hearing on September 10, 2002, the ALJ first established the fact that Plaintiff could continue to work as a welder, roofer, or maintenance worker if he were limited to unskilled work, i.e., work involving only short, simple instructions with no direct interaction with the general public or changes in the work setting.[28]　Indirectly, the VE

---

[28]　In addition to the other problems discussed more fully in the text, we find Dr. Reed's testimony on this point internally inconsistent. He first testified that the jobs of welder, truck driver, truck mechanic and roofer were all semi-skilled. In response to the very next question by the ALJ, limiting Plaintiff to unskilled jobs, he stated, ""I believe he could perform welding, roofer, maintenance worker and that's it probably." That is, of the three jobs identified as unskilled work Plaintiff could perform, two had just been defined as semi-skilled. Dr. Reed excluded insulation installer which he described as unskilled even though it satisfied the ALJ's other limitation to medium-level work. (Tr. 715-716.)

30

testified that Plaintiff could no longer work as a truck driver, truck mechanic or insulation installer. (Tr. 715-716.) The ALJ then posed the following hypothetical question:

Dr. [Amin] in Exhibit 14F, includes [sic] that this individual would be limited to lifting 10 pounds occasionally, 5 pounds frequently, standing and walking unaffected, sitting unaffected, occasionally engage in all the postural limitations, would that change your testimony?

(Tr. 716.)

The VE replied:

Yes, Your Honor. I think with the lifting restrictions even though standing and walking is [sic] not affected, we'd be talking about a limited range of light work and full range of sedentary. So it would eliminate the positions and the past relevant work that I identified.

(Tr. 716.)

In the ALJ's next hypothetical question, he stated that "this individual should avoid heights, moving machinery, temperature extremes and would be limited in terms of push, pulling, handling and reaching to the 10 pounds and 5 pounds I indicated earlier." (Tr. 716.) In response the VE identified three jobs which he categorized as "light unskilled" - expediter, unskilled file clerk, and security guard.[29] (Tr. 716-717.)

The ALJ's hypothetical limited Mr. Doyle to work which required "lifting 10 pounds occasionally, 5 pounds frequently" (Tr. 716), a

_____

[29] Dr. Reed subsequently excluded the job of "unskilled file clerk" from further consideration because of the "handling, reaching, pushing and pulling" involved. (Tr. 716-717.)

31

limitation which does not describes light work. Social Security regulations define "light" work as that which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b) and 416.967(b); *compare* "sedentary" definition in margin below.[30]

It is clear from the hypothetical that the ALJ did not include the ability to lift as much as 20 pounds and the formula used, i.e., "10 pounds occasionally, 5 pounds frequently," has been identified as describing sedentary work in other cases. *See*, e.g., Najmi-Nejad v. Barnhart, No. 02-4477, 2003 U.S. App. LEXIS 18633, *5 (3d Cir. Aug. 30, 2003); Foley v. Barnhart, 432 F. Supp.2d 465, 471 (M.D. Pa. 2005); Odrick v. Barnhart, CA No. 04-8412, 2003 U.S. Dist. LEXIS 12093, *38 (E.D. Pa. July 11, 2003). Thus, the VE erred by describing jobs limited to lifting 10 pounds as a "limited range of light," rather than sedentary, jobs and the ALJ erred by failing to question this description.

This error was further compounded by the fact that the

[30] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. See 20 C.F.R. §§ 404.1567(a) and 416.967(a).

Vocational Expert went on to describe two jobs a claimant with Mr. Doyle's characteristics could perform. The first he described as

light unskilled security guards. There's a total of about [325,000] in that category. I would restrict the figure to about 100,000, that would exclude outdoor work where they would be doing rounds in temperature extremes, so it's basically indoor security guard.

(Tr. 716.)

The second job was defined as "light, unskilled expediters," which Dr. Reed further explained involved "expediting special orders by counting paperwork through a plant, finding out what's holding up the process or, or trying to make it a rush order, that type of thing." (Tr. 717.) In a follow-up question by the ALJ, the VE testified that his descriptions of the jobs conformed to the descriptions thereof as they appeared in the *Dictionary of Occupational Titles* ("*DOT.*") (Tr. 719.)[31]

"The Social Security Administration has taken administrative notice of the reliability of the job information contained in the *Dictionary of Occupational Titles* . . . and often relies upon it at steps four and five of the evaluation process." Burns, 312 F.3d at 126, *citing* 20 C.F.R. § 416.966(d). The problem here is that the positions described by the VE either do not satisfy the criteria of

---

[31] In his brief in support of the motion for summary judgment, Defendant asserts, without support, that "the jobs identified by the vocational expert and relied upon by the ALJ are light exertional jobs." (Id. at 17.) While it is true that at least *some* of the jobs are classified as sedentary or light, none of them is classified as "light unskilled."

33

the ALJ's hypothetical questions or simply do not exist in the *DOT*, e.g., "indoor security guard." *See* Burnett, 220 F.3d at 124 ("An illusory definition in the *DOT* cannot be relied upon.")

The *DOT* lists four jobs under the title of "expediter," two of which are specific to the optical goods and furniture industries.[32] Inasmuch as Dr. Reed did not refer to any particular industry, we assume he was speaking of the more generic occupations. However, even if we conclude Dr. Reed had in mind one or both of the other two positions in this category, "Expediter (clerical)," number 222.367-018, or "Expediter (clerical)," number 21.267-042, neither satisfies the criteria set out in the ALJ's hypothetical question.[33]

_____

[32] *See DOT*, Expediter Clerk (optical goods), 221.387-026, and Expediter, Service Order (furniture), 222.367-070. Both of these jobs are light, but semi-skilled. *See* job descriptions at *DOT*, revised 4th edition (1991), provided by the U.S. Department of Labor at www.occupationalinfo.org (last visited March 20, 2008), "Online DOT."

[33] Expediter (clerical), number 222.367-018, is described in the DOT as follows: "Contacts vendors and shippers to ensure that merchandise, supplies, and equipment are forwarded on specified shipping date. Contacts vendor by mail, phone, or visit to verify shipment of goods on specified date. Communicates with transportation company to preclude delays in transit. May arrange for distribution of materials upon arrival. May contact vendors to requisition materials. May inspect products for quality and quantity to ensure adherence to specifications."

Expediter (clerical), number 221.267-042, is described as follows: "Compiles and maintains material and parts inventory and status information to expedite movement of material and parts between production areas, according to predetermined production schedules and order priorities. Reads production schedules, inventory reports, and work orders to determine type and quantity of materials required, availability of stock, and order priority. Confers with department supervisors to determine overdue material and parts and to inform supervisors of material status. Locates and distributes materials to specified production areas, manually or using handcart, handtruck, or forklift. Records and maintains perpetual inventory of quantity and type of materials and parts received, stocked, and distributed,

34

According to the SSA, unskilled work "needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days" or from a short demonstration. Such work is described as having a specific vocational preparation ("SVP") rating of 1 or 2. *See* SSR 00-4p, "Use of Vocational Expert and Vocational Specialist Evidence and Other Reliable Occupational Information in Disability Decisions;" *see also DOT*, Appendix C, defining SVP as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." The first expediter position, 222.367-018, requires a specific vocational preparation level of 6 which involves training and on-the-job education of at least one year and up to two years. *See DOT*, Appendix C, id., and SSR 00-4p, describing work requiring an SVP of 6 as skilled work. It is rated as sedentary, which means it is within the required exertional level since a person who is capable of performing light work is presumed to be able to perform sedentary work as well unless there are limitations on the length of

manually or using computer. Compiles and maintains records, such as material inventory records, production records, and timecards, manually or using computer. May direct INDUSTRIAL-TRUCK OPERATOR (any industry) 921.683-050 or MATERIAL HANDLER (any industry) 929.687-030 to expedite transfer of materials from stock area to production areas. May examine material received, verify part numbers, and check discrepancies, such as damaged or unmarked parts. May compare work ticket specifications to material used at work stations to verify appropriate assignment. May drive truck to outlying work areas to check status of orders or to deliver materials." Online DOT.

time he is able to sit or his manual dexterity. *See* 20 C.F.R. §§ 404.1567(b) and 416.967(b). The second expediter position, 221.267-042, is rated as medium in exertion with an SVP of 4, indicating that it is semi-skilled work. *See* SSR 00-4p, id. Thus, neither of the expediter jobs identified by the Vocational Expert satisfies the hypothetical questions limiting Mr. Doyle to unskilled light work.

The *DOT* identifies two "security guard" positions. (*See* descriptions set out in the margin.[34]) Both are defined as light and

---

[34] Security Guard (business ser.), number 372-667-038, is described as: "Patrols assigned territory to protect persons or property. Tours buildings and property of clients, examining doors, windows, and gates to assure they are secured. Inspects premises for such irregularities as signs of intrusion and interruption of utility service. Inspects burglar alarm and fire extinguisher sprinkler systems to ascertain they are set to operate. Stands guard during counting of daily cash receipts. Answers alarms and investigates disturbances [ALARM INVESTIGATOR (business ser.)]. Apprehends unauthorized persons. Writes reports of irregularities. May call headquarters at regular intervals, using telephone or portable radio transmitter. May be armed with pistol and be uniformed. May check workers' packages and vehicles entering and leaving premises."

Guard, Security (any industry), number 372.667-034, involves the following: "Guards industrial or commercial property against fire, theft, vandalism, and illegal entry, performing any combination of following duties: Patrols, periodically, buildings and grounds of industrial plant or commercial establishment, docks, logging camp area, or work site. Examines doors, windows, and gates to determine that they are secure. Warns violators of rule infractions, such as loitering, smoking, or carrying forbidden articles, and apprehends or expels miscreants. Inspects equipment and machinery to ascertain if tampering has occurred. Watches for and reports irregularities, such as fire hazards, leaking water pipes, and security doors left unlocked. Observes departing personnel to guard against theft of company property. Sounds alarm or calls police or fire department by telephone in case of fire or presence of unauthorized persons. Permits authorized persons to enter property. May register at watch stations to record time of inspection trips. May record data, such as property damage, unusual occurrences, and malfunctioning of machinery or equipment, for use of supervisory staff. May perform janitorial duties and set thermostatic controls to maintain specified temperature in buildings or cold storage rooms. May tend furnace or boiler. May be deputized to arrest trespassers. May regulate vehicle and pedestrian

36

semi-skilled jobs with an SVP of 3, again above the skill level set out in the hypothetical questions. Thus the VE's testimony that his answers conformed to the *DOT* descriptions was inaccurate.

Theoretically, Dr. Reed could have remedied this problem by explaining that a *DOT* description lists the *maximum*, not average or minimal, job qualifications for a position. *See* <u>Taylor v. Barnhart</u>, 474 F. Supp.2d 650, 671 (D. Del. 2007). Or he could have relied on his own experience to testify that these jobs also exist at the light, unskilled level. *See* <u>Faulkner v. Astrue</u>, CA No. 06-202, 2007 U.S. Dist. LEXIS 74866, *41-*42 (D. Del. Oct. 9, 2007) (a VE is qualified based on education, training, and experience and SSR 00-4p does not limit his or her opinion solely to the *DOT* descriptions.) But in the absence of such explanations, his testimony cannot be considered substantial evidence on which the ALJ could reasonably rely. *See* SSR 00-4p, "Adjudicators may not rely on evidence provided by a VE. . .if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions."

We recognize that the Third Circuit Court of Appeals has "not adopted a general rule that an unexplained conflict between a VE's testimony and the *DOT* necessarily requires reversal." <u>Boone</u>, 353 F.3d at 206; *compare* <u>Rutherford</u>, 399 F.3d at 557-558, holding that

---

traffic at plant entrance to maintain orderly flow. May patrol site with guard dog on leash. . . ." Online DOT.

where not all jobs identified by the VE as examples of work the plaintiff could perform were inconsistent with the limitations posed in the ALJ's hypothetical question although some jobs were beyond the skill level identified by the ALJ, the "minor inconsistencies" in the VE's statements did not preclude his testimony from providing substantial evidence for the ALJ's conclusions. Here, however, we find more than minor inconsistencies; that is, the VE did not identify *any* jobs which conformed to the ALJ's limitations in his hypothetical questions. In such circumstances, the appropriate action by this Court is to remand for further consideration. *See* Boone, 353 F.3d at 209, holding that where the VE's testimony was inconsistent with *DOT* information and there was no other substantial evidence in the record to support the ALJ's determination at step five, remand was necessary.

4. *Plaintiff's "Continuing Disability:"* Plaintiff argues that the ALJ erred by finding he was not disabled for the entire period between November 8, 1999, through June 20, 2002, due to hepatitis C and the side effects of the medications he has taken to treat his conditions. (Plf.'s Brief at 12; Reply Brief for Plaintiff, Docket No. 21, at 1.) He contends that his "conditions caused severe limitations in his ability to perform work related functions for extended periods of time that would far exceed a reasonable accommodation by any employer," and that the medical evidence and his testimony support the conclusion that his

impairments were totally disabling throughout the entire period in question. (Reply Brief at 2.)

We first note that the mere existence of a condition or disease does not entitle the claimant to disability benefits; rather, as noted above, the limitations experienced as a result of the impairment must preclude all substantial gainful activity for a period of twelve months or more. *See* Hall v. Barnhart, CA No. 02-8481, 2004 U.S. Dist. LEXIS 6941, * 21 (E.D. Pa. Apr. 23, 2004) ("It is not enough for the plaintiff to demonstrate the existence of an impairment. It must be established that the impairment results in functional limitations so severe that it precludes the plaintiff from engaging in any substantial gainful activity.") Plaintiff would have us rely on the fact that from November 1999 through at least February 2001, the sequential employment assessment forms of Drs. Bedlion and Amin show that he was disabled at least that long.

Social Security regulations provide that a decision by another agency, e.g., a state workers compensation program, the federal Department of Veterans Affairs, or an insurance company, that a claimant is disabled is not binding on the SSA because different standards may be used to define "disability." 20 C.F.R. §§ 404.1504 and 416.904.[35] Moreover, we find Plaintiff's argument that he was

---

[35] We recognize that SSR 06-03p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies," requires an ALJ to evaluate evidence such as a state department of public welfare employability form according to the standards for evaluating evidence

totally disabled from November 1999 through June 2002, based on reports which cover only the 14-month period from November 1999 through February 2001, unpersuasive in light of reports from his physicians on October 31, 2000,[36] and August 29, 2001, that he was able to return to work and, in fact, had sought approval from his doctors to do so. *See*, respectively, Tr. 499 and Tr. 591. On the other hand, there are two reasons we hesitate to eliminate the possibility that Plaintiff did not become disabled sometime after October 31, 2000, for example, beginning in April 2001 when he attempted the Rebetron protocol and suffered severe side effects. First, we believe the ALJ should have determined why Plaintiff did not return to work as of October 2000 despite the doctor's release. Second, Dr. Bedlion's note of August 29, 2001, in which he stated that Plaintiff "really should be able to work" (Tr. 591) seems to

---

from non-medical sources and to explain the consideration given to such decisions. Although Judge Bukes mentioned the Department of Public Welfare reports prepared by Drs. Amin and Bedlion in his decision (Tr. 396), he did not evaluate those reports as set out in SSR 06-03p. However, we cannot conclude that this omission was error on his part because the Social Security Ruling in question was not promulgated until after his January 30, 2003 opinion.

[36] The ALJ does not specifically identify the document of October 31, 2000, and credits Dr. Bedlion with this report. (Tr. 396.) Despite a close review of the medical record, the Court has been unable to identify any notes from Dr. Bedlion as of that date. There is, however, a note in his files dated October 26, 2000, stating that Mr. Doyle "came in requesting a release to go back to work with no restrictions. Doctor [Bedlion] said he did not put him off work and that he needs to [have] his Pittsburgh doctor release him." (Tr. 332.) If this is the note to which the ALJ was referring, it does not state that Dr. Bedlion released Plaintiff to return to work. We believe the ALJ must have been referring instead to Dr. Amin's work release of October 31, 2000, at Tr. 499.

40

consider only the condition of Mr. Doyle's hands. That is, Dr. Bedlion's opinion did not address the effect of hepatitis C or its treatment on Mr. Doyle's ability to work.[37]

Defendant argues that "it is the medication used to treat his hepatitis, not the hepatitis itself, which causes the functional limitations that result in Plaintiff's disability. Indeed the ALJ noted that Plaintiff's symptoms abate when he stops treatment." (Def.'s Brief at 14, *citing* Tr.14.) To the extent he is arguing that under such circumstances, Mr. Doyle could not have been found disabled, that conclusion is incorrect.

An ALJ must explicitly address any side effects that Plaintiff claims to suffer due to medication. *See* Stewart v. Secretary of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir. 1983) (remanding, in part, because ALJ failed to explain his implicit rejection of plaintiff's testimony regarding side effects); *see also* Correa v. Comm'r of Soc. Sec., 381 F. Supp.2d 386, 397 (D. N.J. 2004) (noting that where the ALJ has failed to address the claimant's allegations that medication caused severe side effects, the case would be remanded to determine if the medication in question did cause the alleged side effects and if those side effects were disabling.)

---

[37] To the best of the Court's ability to decipher it, in full, this note reads – "(2) Hep C – 15 [??] minute discussion with patient about why I didn't think he can get disability. His attorney is to call me. Patient really should be able to work. His hands no longer hurt?" (Tr. 591.)

41

What the ALJ actually wrote in his April 2001 opinion was that Plaintiff had noted "that some of his symptoms had abated since he had stopped taking medications in January 2001." (Tr. 15.)[38] A similar sentence appears in the January 2003 opinion at Tr. 395. However, there is no explicit finding in the second opinion as to whether the underlying symptoms, e.g., fatigue, headaches, nausea, were themselves disabling even when treatment was not in progress. Moreover, the fact that Plaintiff testified at the hearing on February 7, 2001, that "some" of his symptoms "abate" when he was not taking medication does not necessarily mean that they disappear or were not disabling. In fact, he testified that he still had "residual symptoms from the drugs. . .headaches every day and muscle aches in my legs, but they're not near as bad as it was when I was taking the medicine." (Tr. 360.) He provided similar testimony at the hearing on September 10, 2002. (Tr. 698, 700.)

Nothing in the record as it currently appears resolves the question of whether there was any consecutive twelve month period prior to June 21, 2002, in which Mr. Doyle was unable to work as a result of either the symptoms of his hepatitis C and porphyria, the side effects of his medications, or a combination thereof. We

---

[38] This is another mysterious conclusion by the ALJ because there is no medical evidence that Mr. Doyle stopped taking medication as of January 2001. We recognize that Mr. Doyle testified at the February 7, 2001 hearing that he saw Dr. Amin on January 22, 2001 and was told at that time that he should stop taking infergen. (Tr. 363.) However, Dr. Amin's medical records indicate that Mr. Doyle stopped taking infergen as of October 2000. (Tr. 497.)

42

conclude remand is necessary in order for the ALJ to determine the answers to these questions.

     5.    *Plaintiff's Disability Status Prior to June 21, 2002:* As noted above, the ALJ concluded that as of June 21, 2002, Plaintiff's "condition deteriorated and his symptoms worsened to the point that he could not work a full eight hour day due to fatigue, dizziness and headache as manifested in the treatment records from UPMC Health System of that date (Exhibit 18F) and Dr. Sartori's examination of July 29, 2002 (Exhibit 20F)." (Tr. 398.) In considering the medical records on which the ALJ relied at this point in his decision, we find this conclusion confusing, at best, and in need of clarification.

     The ALJ does not explain in his January 2003 opinion why he concluded that Mr. Doyle's "condition," *per se*, deteriorated in June 2002, and the Court has been unable to identify any medical report which implies that his hepatitis C, porphyria, depression and/or anxiety became increasingly severe at that time. The record is clear that on June 5, 2002, Mr. Doyle began his third chemotherapy protocol in an attempt to prevent his liver condition from worsening. Following the third dose of pegylated interferon with ribavirin, Mr. Doyle began to experience nausea, chills, myalgia, particularly in the back of his leg, insomnia, extreme fatigue, flu-like symptoms, and nosebleeds which he reported to Dr. Chopra on June 21, 2002. (Tr. 606.) When examined on June 27, he also

43

reported that he was experiencing occasional right upper quadrant pain, redness at the injection sites on his upper thighs, and a few small blisters on his right hand which Dr. Chopra attributed to his porphyria cutanea; he denied any other symptoms. (<u>Id.</u>) He had lost 8 pounds in less than two weeks since beginning treatment. He also "expressed a desire to continue treatment regardless of how sick it is making him or how awful he feels." (Tr. 608.) Dr. Chopra ordered a number of blood tests and suggested possible changes in his medication for insomnia and nausea. (<u>Id.</u>)

In his opinion, the ALJ noted that Plaintiff experienced "some side effects" from the June 2002 treatment, but concluded based on Dr. Chopra's report that Mr. Doyle had "adequate avenues available to him to control these side affects [sic]." (Tr. 396, referring to Exhibit 13F.) The Court has been unable to determine the basis of the ALJ's conclusion that the side effects were controlled; for instance, Dr. Chopra stated in his report that Ambien was no longer effective in treating Plaintiff's insomnia and that past trials of trazodone had caused increased nausea. (Tr. 608.) Similarly, compazine, which had been prescribed to treat his nausea, had caused severe headaches and Dr. Chopra suggested only that taking his other medications with food might alleviate the problem. Mr. Doyle did not want to take psychotropic drugs and reported that many drugs caused nausea, making him reluctant to try new medications. Dr. Chopra's concluding comment was that "we will continue to work with

him on this" in the hope of being able to complete the 48-week treatment cycle.[39] Moreover, it follows that if the dizziness, fatigue, headaches, etc. were under control, the ALJ would not have concluded that Plaintiff became disabled in June 2002 as the result of the side effects. *See* Dass v. Barnhart, 386 F. Supp.2d 568, 577 (D. Del. 2005), *quoting* Gross v. Heckler, 785 F.2d 1163, 1166 (4ᵗʰ Cir. 1986)("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.")

The ALJ also relied in this portion of his opinion on the report of Dr. Roy J. Sartori who performed a consulting examination for Mr. Doyle on July 29, 2002, and concluded that Plaintiff's physical condition was "entirely unremarkable." (Tr. 654.) Dr. Sartori noted in the section of his report addressing the history of Mr. Doyle's illness:

> The patient's symptoms began in late 1999 when he began to experience [weakness, fatigue, lassitude, and malaise] and they were quite progressive. He seemed to tire easily and did not have the strength and energy from before. He even had apparently some type of increase in sensitivity to noise. He became lightheaded and had episodes of dizziness and blurred vision especially upon exerting

---

[39] In his brief in support of the motion for summary judgment, Defendant states that "due to severe side effects" of the pegylated interferon treatment, "which were expected to last 48 months as documented by Dr. Chopra on June 21, 2002, the ALJ correctly found Plaintiff disabled as of that date." (Def.'s Brief at 13, *citing* Tr. 606-609.) There is no evidence in Dr. Chopra's report that the treatment was to last 48 *months*; to the contrary as noted in the text above, he hoped that they would "be able to continue the treatment for a period of approximately 48 *weeks*." (Tr. 608.) Nor is there any evidence in the January 2003 opinion that the ALJ believed the treatment (and consequently, the debilitating side effects) would last for four years and therefore granted benefits on that basis.

45

himself such as walking short distances. He experienced myalgias in the posterior legs and back area and subsequently a diagnosis of hepatitis C was made. . . . The patient has had quite a bit of anorexia and also insomnia since the diagnosis of hepatitis has been made. The patient's other problems include an alteration in his mental status and psychiatric state. The patient has developed quite a bit of irrationality, suicidal tendencies, major unipolar depression, quite a bit of anxiety and is very sensitive to stressful conditions. He states at times, his mental status is poor and he is confused. This is all the history from the patient. I do not have any verification of this.

(Tr. 652-653.)

The ALJ found Dr. Sartori's report consistent with Dr. Chopra's of June 27, 2002, and concluded that as of June 21, Plaintiff's condition had deteriorated to the point he could no longer work. However, a fair reading of Dr. Sartori's full report does not indicate that he found the deterioration occurred after Plaintiff began his third hepatitis C treatment in June 2002; rather, the symptoms of hepatitis and the side effects of medications are all described in Mr. Doyle's own account of his medical history beginning in 1999. It seems inconsistent for the ALJ to rely on Plaintiff's self-reported symptoms and side effects when they are reported by Dr. Sartori, yet simultaneously find Plaintiff less than fully credible when the same symptoms and side effects were noted in his ADL questionnaires and in his complaints to his physicians during the period 1999 through 2002.

The medical history is clear that each time Mr. Doyle undertook a new drug protocol - not only the June 2002 attempt - he

46

experienced an increase in a wide range of side effects. The first unsuccessful treatment period lasted from April through October 2000; the second and third, beginning in April 2001 and June 2002, respectively, were terminated quickly due to side effects. If the fatigue, dizziness and headaches manifested in June 2002 were sufficiently severe as to preclude Plaintiff from working a full eight hour day as of that point when he was undergoing treatment, we fail to understand why the ALJ determined that they were not equally debilitating prior to that time.

This unexplained inconsistency is particularly relevant to Plaintiff's application for DIB. As the medical evidence and Plaintiff's testimony showed, Plaintiff's fatigue, dizziness, headaches and other chronic symptoms occurred not only during but between treatment cycles. Because the ALJ failed to consider all the evidence and testimony, his conclusions about the extent to which Mr. Doyle was disabled over longer time periods may have been incorrect. If so, Plaintiff could have been found disabled prior to December 31, 2001, and therefore entitled to at least a closed period of disability insurance benefits.

On remand, the ALJ should explain why he arrived at two diametrically opposed conclusions regarding the symptoms arising from Mr. Doyle's hepatitis, particularly the chronic fatigue, and determine, based on the medical evidence and other evidence of record, if and when those symptoms became disabling prior to June

47

21, 2002. Moreover, he should review the medical evidence for the entire period under consideration and determine if at any point Mr. Doyle was eligible for a closed period of disability and disability benefits.

## V.   FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

This Court is cognizant that its role does not include a re-weighing of the evidence presented to the ALJ. However, our role does extend to "considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's findings." Monsour Medical Center, 806 F.2d at 1191. Here, we find that the ALJ's numerous errors, omissions and inconsistencies take his decision outside the scope of meaningful review by this Court.

In light of this fact, we are unable to determine if Mr. Doyle was sufficiently disabled by the combination of his physical and mental impairments, including the side effects of his medications,

48

such that he was unable to perform substantial gainful activity and thus entitled to either disability insurance benefits, a closed period or periods of disability, and/or supplemental security income benefits at any time prior to June 21, 2002. While we are reluctant to remand this case, particularly when we consider how long this matter has been pending, we do so with the expectation that the Commissioner will speedily resolve the questions raised herein.

An appropriate order follows.

April ___2___, 2008

William L. Standish
United States District Judge

cc: Counsel of Record